Revel XP, LLC v. Never Forget Brands, LLC, 2022 NCBC 39.

STATE OF NORTH CAROLINA

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
22 CVS 384

REVEL XP, LLC,

       Plaintiff,

v.

NEVER FORGET BRANDS, LLC
d/b/a GAMEDAY VODKA,

       Defendant.

**ORDER AND OPINION ON MOTION
TO DISMISS FOR LACK OF
PERSONAL JURISDICTION**

1.    **THIS MATTER** is before the Court on Defendant Never Forget Brands, LLC d/b/a GameDay Vodka's ("GameDay") Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion") filed on 1 April 2022.  (ECF No. 7 ["Mot."].)

2.    Having considered the Motion, the related briefing, affidavits, exhibits, and arguments of counsel at the hearing on the Motion, the Court hereby **DENIES** the Motion for the reasons set forth herein.

> *Kilpatrick Townsend & Stockton LLP by Whitney R. Pakalka and Richard J. Keshian for Plaintiff Revel XP, LLC.*
>
> *Wyatt Early Harris Wheeler LLP by Scott F. Wyatt and Donavan John Hylarides, and The Law Office of L.W. Cooper, Jr. by Nicholas P. Tierney, pro hac vice, for Defendant Never Forget Brands, LLC.*

Robinson, Judge

## I.    INTRODUCTION

3.    Plaintiff Revel XP, LLC, ("Revel") contends that GameDay breached a marketing agreement between the parties by ceasing to pay Revel for its marketing

services. GameDay moves to dismiss Revel's claims against it, pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure ("the Rule(s)") on the grounds that GameDay is not subject to personal jurisdiction in North Carolina.

4. The parties have each submitted briefing and evidence in the form of affidavits and exhibits in support of and in opposition to GameDay's Motion. The Court held a hearing on 15 June 2022. Having considered all relevant matters, the Court finds the following facts by a preponderance of the evidence and makes the following conclusions of law.

## II.     FINDINGS OF FACT

5. Revel is a North Carolina Limited Liability Company with its principal place of business in Winston-Salem North Carolina, which hosts, staffs and promotes events for professional and collegiate sports fans. (Machosky Aff. ¶¶ 29–32, ECF No. 19.) Revel contracts with collegiate and professional sports teams for the right to host and staff special events, including tailgate parties, and Revel grants sponsorship rights to vendors looking to promote their brands at these events. (Machosky Aff. ¶¶ 14–17, ECF No. 19.)

6. Revel is owned in majority by Teall Sports & Entertainment, LLC, which in turn is owned and managed by Teall Capital, based in Winston-Salem, with offices at 500 West Fifth Street (Suite 1200), Winston-Salem, North Carolina. (Machosky Aff. ¶¶ 8–12.)

7. GameDay is a South Carolina Limited Liability Company with its principal place of business in Charleston, South Carolina. (David Aff. ¶ 5, ECF No. 9.4.) GameDay markets, distributes, and sells vodka and related products. (David Aff. ¶ 5.)

8. GameDay has licensure agreements and partnerships with collegiate and professional sports teams in the states of South Carolina, Texas, Florida, Tennessee, New York, Louisiana, Maryland, and Colorado. (*See* David Aff. ¶ 6.) GameDay does not have any partnerships, licensure agreements, affiliations, or agreements with any college or professional sports entities in North Carolina. (David Aff. ¶ 7.)

9. GameDay is not registered to do business in North Carolina, does not have a license to sell liquor in North Carolina, and does not maintain any physical location or own real property in North Carolina. (Nieves Aff. ¶¶ 31–34, ECF No. 9.5; David Aff. ¶ 32.)

10. Revel's Director of Business Development, Glenn Gronkowski ("Gronkowski") initiated contact with GameDay in February 2021 after seeing GameDay Vodka billboards in Tampa, Florida while traveling there for the Super Bowl. (Machosky Aff. ¶¶ 43, 46–48.) Gronkowski messaged Ray Horal ("Horal"), GameDay's Chief Sales Officer, via LinkedIn on 18 February 2021 and said that Revel's services "might be a great way for [GameDay] to be a part of our platform and drive additional sales at 'game days' across America. Would love to discuss further if interested." (Machosky Aff. Ex. A., ECF No. 19.1.)

11. Horal followed-up on 19 February 2021 and provided an 85-page "Brand Deck" to Gronkowski and explained that GameDay was "deep into the planning process

of a rather disruptive 2021 GameDay Tailgate Tour that'll run throughout FL, GA, SC, TX, LA, CO, MD, & numerous other markets." (Def.'s Ex. 3, ECF No. 9.3 ["Horal Email"].)

12. From February 2021 through 3 March 2021, Revel employee AJ Machosky ("Machosky") engaged in exploratory discussions with GameDay employees Horal, Charles Nieves ("Nieves"), and Giuliana Rossi ("Rossi") regarding a potential relationship between Revel and GameDay. (Machosky Aff. ¶¶ 53–56.)

13. All negotiations between Revel and GameDay took place remotely via phone calls and videoconferences. (David Aff. ¶ 14.) None of the participants in these conversations were physically located in North Carolina except as described in paragraph 17 *infra*. (David Aff. ¶ 13.)

14. On 4 March 2021, Horal sent Machosky a 30-page presentation (the "GameDay Pitch Deck") created by GameDay, which discussed a potential marketing partnership between Revel and GameDay. (Machosky Aff. ¶ 56, Machosky Aff. Ex. D, ECF No. 19.4 ["GameDay Pitch Deck"].)

15. Page 10 of the GameDay Pitch Deck is titled "Distribution Roadmap" and contains a list of U.S. markets in which GameDay intended to begin distributing its vodka. (*See* GameDay Pitch Deck 10.) North Carolina is the first state GameDay listed for the year 2022. (*See* GameDay Pitch Deck 10.)

16. Page 11 of the GameDay Pitch Deck, titled "Partnership Roadmap," contains a list of collegiate and professional sports organizations with which GameDay sought to establish partnerships during each year from 2021–23. (*See* GameDay Pitch Deck 11.)

Duke University, located in Durham, North Carolina, is listed as a partner for the year 2023. (*See* Pitch Deck 11.)

17. On 24 March 2021, Machosky participated in a videoconference with Horal and Rossi and presented Revel's proposal for a marketing agreement with GameDay (the "24 March Zoom Call"). (Machosky Aff. ¶ 62.) Machosky, although a resident of Michigan, was in Charlotte, North Carolina during the 24 March Zoom Call because he was involved in one of Revel's Topgolf Live events taking place at Charlotte's Bank of America Stadium. (Machosky Aff. ¶ 64–65.) During the 24 March Zoom Call, Machosky presented a pitch deck prepared by Revel (the "Revel Pitch Deck") to GameDay representatives. (Machosky Aff. Ex. E, ECF No. 19.5 ["Revel Pitch Deck"].)

18. Page 3 of the Revel Pitch Deck contains a map of Revel's existing collegiate and professional sports partnerships, including four universities in North Carolina. (Revel Pitch Deck 3.) During the presentation, Horal indicated to Machosky that GameDay wished to expand into North Carolina. (Machosky Aff. ¶ 74.)

19. Following the 24 March Zoom Call, Revel and GameDay, with the assistance of legal counsel, exchanged drafts of a proposed written marketing agreement. (Machosky Aff. ¶ 76.)

20. On 20 May 2021, the parties finalized the terms of a written marketing agreement (the "Agreement"), which was signed by Machosky on behalf of Revel and by Zach David on behalf of GameDay. (Machosky Aff. ¶ 80; Marketing Agreement 1, 9 ["Agrmt."].) The Agreement was executed by use of DocuSign, and none of the signatories were located in North Carolina at the time of execution. (David Aff. ¶ 14.)

21. The Agreement, in its opening paragraph, identifies Revel as a North Carolina limited liability company. (Agrmt. 1.)

22. The Agreement commenced on 20 May 2021 and is set to expire on 30 June 2025. (Agrmt. ¶ 2.)

23. The Agreement states that "[t]his Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without application of its conflicts of laws provisions." (Agrmt. ¶ 25.)

24. The Agreement requires GameDay to make periodic payments to Revel. GameDay is to "submit each payment by check, wire transfer, or Quickbooks invoice payment. If [GameDay] pays by check, then [GameDay] should send the check, together with an invoice identifying this Agreement, to the below remittance address, unless and until [Revel] directs otherwise." (Agrmt. ¶ 5.) The provided remittance address for check payments is a Winston-Salem, North Carolina address which corresponds with Revel's principal place of business. (*See* Agrmt. ¶ 5.)

25. Under the Agreement, Revel is to develop and oversee tailgate parties at sporting events featuring GameDay products. As a part of its performance under the Agreement, "[Revel] is responsible for providing, transporting, maintaining, setting up, taking down and replacing all equipment and physical assets used at Events and that are used to provide Marketing Activities." (Agrmt. ¶ 10(a).)

26. GameDay is to make scheduled payments to Revel. In addition, the Agreement requires that GameDay and Revel enter into written Statements of Work ("SOWs"), which set forth "the scope and value of the Marketing Activities to be

provided by [Revel] to [GameDay]." (Agrmt. 10–12.) A form SOW is attached to the Agreement as Exhibit B, and requires the title, date, location of the event, the marketing activities to take place, the value of the marketing activities, and any additional provisions related to the event. (Agrmt. 13.) Each SOW stated in the opening paragraph that Revel is "a North Carolina limited liability company." (Strickland Aff. ¶ 10, ECF No. 21.)

27.    Pursuant to the Agreement, Revel assigned Kasey Strickland ("Strickland"), a Revel employee, to be a dedicated staff member to effectuate GameDay's events, marketing and promotional activities. (David Aff. ¶ 21, Strickland Aff ¶ 7.)

28.    Strickland was located in Alabama at all times relevant to the Agreement, and along with Machosky, generated all SOWs. (David Aff. ¶ 23.)

29.    Strickland was responsible for implementing activities and services described in SOWs, including coordinating physical set-ups, third-party vendors, and catering services at events under the Agreement. (Strickland Aff. ¶ 12.)

30.    Exhibit D to the Agreement, titled "Revel XP Properties," includes a list of collegiate and professional sports entities with which Revel has an existing relationship. These include the University of North Carolina, North Carolina State University, and Wake Forest University, all located in North Carolina. (Agrmt. 15.)

31.    No events or signed SOWs arising out of the Agreement expressly called for hospitality services, activities or events to be performed or take place in North Carolina. (David Aff. ¶ 18.)

32. No events for which SOWs were prepared and executed ever occurred in North Carolina. (Nieves Aff. ¶ 23.)

33. Charles Nieves ("Nieves"), GameDay's Vice President of Marketing and primary point of contact with Revel regarding the Agreement, claims that he was never informed that any North Carolina-made product or North Carolina vendor was to be used in conjunction with the Agreement, Event, or SOW-related activity. (Nieves Aff ¶ 25.)

34. Beginning in July 2021, GameDay asked Strickland to procure a variety of branded items with GameDay's logos and designs to be used at events hosted or sponsored by GameDay under the Agreement, including drink coolers, photo-op backdrops, and carafes. (Strickland Aff. ¶ 27.) Strickland and other Revel employees identified Symphonix Solutions of Charlotte, North Carolina ("Symphonix") as a vendor that could provide these items. (Strickland Aff. ¶ 27.) On 13 August 2021, Strickland, through email, introduced Nieves to Symphonix employees. (Strickland Aff. ¶ 29.) Nieves then communicated directly with Symphonix and discussed GameDay's need for photo backdrops which Symphonix could provide. (Strickland Aff. Ex. E, ECF No. 21.5.) The Symphonix employees with whom Nieves communicated had email signatures identifying that Symphonix is located in Charlotte, North Carolina. (*See* Strickland Aff. Ex. E.) Following Nieves's direct communication with Symphonix, on 28 September 2021, Nieves and Machosky executed SOW No. 39 authorizing the purchase of branded drink coolers from Symphonix. (Strickland Aff. Ex. B, ECF No. 21.2 ["SOW No. 39."].) On 5 October 2021, Nieves and Machosky executed SOW No. 44 authorizing the

purchase of carafes from Symphonix. (Strickland Aff. Ex. C, ECF No. 21.3.) GameDay also asked that Revel obtain branded umbrellas, which Revel sourced from US Umbrellas in Durham, North Carolina ("US Umbrellas") and which the parties memorialized in a SOW. (Strickland Aff. ¶ 32.)

35. On 5 August 2021, Nieves and Machosky executed SOW No. 19. (Strickland Aff. Ex. A., ECF No. 21 ["SOW No. 19"].) SOW No. 19 reflects the design and purchase by Revel of branded canvas tent tops for GameDay to use at events it intended to sponsor under the Agreement. (Strickland Aff. ¶ 13.) One of the tent tops was co-branded with GameDay and the University of South Carolina. (Strickland Aff. ¶ 15.) Revel does not have a warehouse in South Carolina and requested that the University of South Carolina tent top be delivered to Revel in Winston-Salem, North Carolina instead. (Strickland Aff. ¶ 15.) Upon receipt of the tent top in Winston-Salem, Revel shipped the tent top from Winston-Salem to a third-party tent company in South Carolina for future use at events in that state. (Strickland Aff. ¶ 16.) The SOW indicates on page one that the University of South Carolina tent top was to be shipped to Winston-Salem, North Carolina. (SOW No. 19 at 1.)

36. On 6 October 2021, GameDay published a variety of images and written material on its website and social media pages in honor of National Coaches' Day, writing that "we wanted to highlight some of the most impactful coaches from *some of our partners*." (Charbonneau Aff. Exs. A–C, ECF Nos. 22.1–22.3 (emphasis added).) Duke University's Mike Krzyzewski is the first coach listed and profiled on GameDay's webpage. (Charbonneau Aff. Ex. B.)

37. GameDay made four regular payments to Revel under the Agreement. (*See* Hill Aff. Ex. B, ECF No. 20.2 ["Revel Invoices"].) Revel billed GameDay by submitting invoices which directed GameDay to submit payment to Revel in Winston-Salem. (Hill Aff. ¶ 33.) The first invoice was sent to GameDay on 1 July 2021 in the amount of $500,000, the second invoice was sent to GameDay on 1 September 2021 in the amount of $225,000, the third invoice was sent to GameDay on 1 October 2021 in the amount of $225,000, and the fourth invoice was sent to GameDay on 1 November 2021 in the amount of $225,000. (Revel Invoices 1–4.) GameDay paid each of these invoices, totaling $1,175,000, in 2021 by remitting a series of Automated Clearing House payments to Revel's BB&T bank accounts. (Hill Aff. ¶ 32.)

38. GameDay refused to pay further invoices beginning with the 1 December 2021 invoice in the amount of $225,000. (Hill Aff. ¶ 33.)

39. In addition, GameDay has not paid Revel for more than $100,000 of services provided by third parties that Revel coordinated at GameDay's request. (Hill Aff. ¶ 43.)

40. On 31 December 2021, GameDay sent a letter, addressed to Revel, by e-mail to Machosky and in paper-copy to Revel's Winston-Salem office. In the letter, GameDay alleged that Revel was in breach of the Agreement and that GameDay intended to terminate the Agreement. (Machosky Aff. ¶¶ 89–91; Machosky Aff. Ex. G.) This lawsuit followed.

## III. PROCEDURAL HISTORY

41.     On 21 January 2022, Revel filed its Complaint.  (ECF No. 3.)  On 28 February 2022, this matter was designated to the North Carolina Business Court and assigned to the undersigned.  (*See* Designation Or., ECF No. 1, Assignment Or., ECF No 2.)

42.     On 1 April 2022, GameDay filed the Motion.

43.     The Motion has been fully briefed and the Court held a hearing on the Motion on 15 June 2022 at which all parties were represented by counsel.  (*See* Not. of Hearing, ECF No. 25.)

44.     The Motion is ripe for determination.

## IV. ANALYSIS AND CONCLUSIONS OF LAW[1]

45.     "When a defendant challenges the court's jurisdiction under Rule 12(b)(2), the burden falls on the plaintiff to establish that grounds for asserting [personal] jurisdiction exist." *AYM Techs., LLC v. Rodgers*, 2018 NCBC LEXIS 14, at \*6 (N.C. Super. Ct. Feb. 9, 2018); *see also Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671 (2001) ("The burden is on the plaintiff to prove by a preponderance of the evidence that grounds exist for the exercise of personal jurisdiction over a defendant.")

46.     "In a case where, as here, 'both parties submit competing affidavits . . . and the trial court holds a hearing on personal jurisdiction, the trial court should consider the matter as if an evidentiary hearing had occurred.' " *Quidore v. Alliance Plastics, LLC,* 2020 NCBC LEXIS 63 at \*4 (N.C. Super. Ct. May 19, 2020) (quoting *AYM Techs.,*

---

[1] Any findings of fact that are more appropriately deemed conclusions of law are incorporated by reference into the Court's analysis and conclusions of law.  *See Sheffer v. Rardin*, 208 N.C. App. 620, 624 (2010) (providing that the appellate court will treat findings of fact that are "more properly designated" as conclusions of law as such for the purposes of an appeal).

2018 NCBC LEXIS 14, at *6–7). "In such circumstances, the trial court must 'act as a fact-finder, and decide the question of personal jurisdiction by a preponderance of the evidence[.]'" *Parker v. Town of Erwin*, 243 N.C. App. 84, 97 (2015) (quoting *Deer Corp. v. Carter*, 177 N.C. App. 314, 322 (2006)).

47.     Notwithstanding the fact that this Court is to find facts from the evidence presented, there is little dispute between the parties about the relevant facts, as discussed in paragraphs 5–40 *supra*. Rather, the dispute between the parties centers on the legal effect of those facts.

48.     In North Carolina, determining whether personal jurisdiction exists is a "two-step analysis." *Beem USA LLLP v. Grax Consulting, LLC*, 373 N.C. 297, 302 (2020). "First, jurisdiction over the defendant must be authorized by N.C.G.S. § 1-75.4 — North Carolina's long-arm statute. Second, if the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Id.*

49.     "[B]ecause North Carolina's long-arm statute has been interpreted to allow the exercise of personal jurisdiction to the fullest extent allowed under the due process clause, the two-step analysis collapses into one inquiry." *Worley v. Moore*, 2017 NCBC LEXIS 15, at *19 (N.C. Super. Ct. Feb. 28, 2017).

50.     For a court to exercise personal jurisdiction, "there must be sufficient minimum contacts between the nonresident defendant and our state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Skinner v. Preferred Credit*, 361 N.C. 114, 122 (2006) (quoting *Int'l Shoe Co.*

*v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted). As our Supreme Court explained in *Beem*:

> Personal jurisdiction cannot exist based upon a defendant's "random, fortuitous, or attenuated" contacts with the forum state, *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (quoting *Burger King*, 471 U.S. at 475), but rather must be the result of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Skinner*, 361 N.C. at 133 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). As such, a defendant's contacts with the forum state must be such that a defendant "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see also Skinner*, 361 N.C. at 133 ("A crucial factor is whether the defendant had reason to expect that he might be subjected to litigation in the forum state.").

373 N.C. at 303 (cleaned up).

51.    There are two types of personal jurisdiction: general (or "all-purpose") jurisdiction and specific (or "case-based") jurisdiction. *See Beem,* 373 N.C. at 303 *(*citing *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014)). General jurisdiction applies where the defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction focuses on "the relationship among the defendant, this State, and the cause of action." *Tom Togs, Inc. v. Ben Elias Industries Corp.*, 318 N.C. 361, 366 (1986). "There must be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *A.R. Haire, Inc. v. St. Denis*, 176 N.C. App. 255, 260, (2006) (citing *Dillon v. Numismatic Funding Corp.*,

291 N.C. 674, 679 (1977)). "In determining minimum contacts, the court looks at several factors, including: (1) the quantity of the contacts; (2) the nature and quality of the contacts; (3) the source and connection of the cause of action with those contacts; (4) the interest of the forum state; and (5) the convenience to the parties." *Id.* (citation omitted). "These factors are not to be applied mechanically; rather, the court must weigh the factors and determine what is fair and reasonable to both parties. No single factor controls; rather, all factors must be weighed in light of fundamental fairness and the circumstances of the case." *Id.* (cleaned up).

52. GameDay contends that it is not subject to either general or specific jurisdiction in this Court. Revel concedes that GameDay is not subject to general jurisdiction in this Court, arguing instead that GameDay is subject to specific jurisdiction pursuant to GameDay's alleged breach of the Agreement. Therefore, the Court analyzes the facts and law only as they relate to specific jurisdiction.

53. The Supreme Court of the United States has long held that the Due Process Clause does not preclude a state court from entering a judgment binding on a contracting party when "the suit was based on a contract which had substantial connection with that [s]tate." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957).

54. There is no mechanical test for determining jurisdiction between contracting parties. *Toshiba Global Commerce Sols., Inc. v. Smart & Final Stores LLC*, 2022-NCSC-81 ¶ 10. The inquiry does not turn on "the place of contracting or of performance," nor can "an individual's contract with an out-of-state party *alone* . . . automatically establish sufficient minimum contacts in the other party's

home forum[.]" *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 478 (1985) (emphasis in original). Instead, courts are to consider the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Toshiba Global Commerce Sols., Inc,* 2022-NCSC-81 ¶ 10 (quoting *Burger King*, 471 U.S. at 479).

55. Weighing all of the evidence, the Court concludes that the parties' actual course of dealing and contemplated future consequences demonstrate that the Agreement has a substantial connection with North Carolina and therefore the exercise of jurisdiction over GameDay comports with due process.[2]

A. Prior Negotiations

56. Revel's pre-contract dealings with GameDay did not make clear that GameDay knew it was availing itself of the privilege of doing business in North Carolina. All of Revel's primary points of contact were located outside of North Carolina. Gronkowski, who first solicited GameDay, was located in Texas. Machosky and Strickland, with whom GameDay generated SOWs, were located in Michigan and Alabama, respectively. GameDay hosts events nationwide and has employees located nationwide, and the negotiations took place almost entirely outside of North Carolina.

57. However, these facts alone do not determine whether the Agreement has a substantial connection with North Carolina. As both *Burger King* and *Toshiba*

---

[2] The Court of Appeals has recently issued several opinions discussing the type of intentional contact necessary to support a finding of minimum contacts comporting with due process. *See Troublefield v. AutoMoney, Inc.,* 2022-NCCOA-497; *Wall v. AutoMoney, Inc.,* 2022-NCCOA-498; *Hundley v. AutoMoney, Inc.*, 2022-NCCOA-489; *Leake v. AutoMoney, Inc.,* 2022-NCCOA-490.

demonstrate, the fact that pre-contract negotiations occur outside the forum state is not alone determinative of jurisdiction. In *Toshiba*, the fact that negotiations took place remotely between employees located in California and Texas did not preclude a finding that the contract had a substantial connection with North Carolina. *Toshiba Global Commerce Sols., Inc. v. Smart & Final Stores LLC*, 2020 NCBC LEXIS 151, at *3–4, 13 (N.C. Super. Ct. Dec. 23, 2020). And in *Burger King*, the Supreme Court of the United States likewise held that there was sufficient evidence that the defendant knew he was affiliating with an entity from the forum state even though the defendant's dealings were principally with representatives outside the forum state. *See Burger King*, 471 U.S. at 480, 487.

58.     Further, while initial discussions between the parties may not have focused on North Carolina as a jurisdiction with significant relationships to the parties' undertaking, by the time the parties began negotiating a written agreement, it became clear that the agreement had significant ties to North Carolina. (*See* paragraphs 59–60 *infra*.)

B.     Contemplated Future Consequences

59.     The record makes clear that GameDay intended to begin doing business in North Carolina during the term of the Agreement. As GameDay's "Partnership Roadmap" and "Distribution Roadmap" clearly show, GameDay hoped to establish a presence in North Carolina during the span of the Agreement and form a partnership with Duke University by 2023. (GameDay Pitch Deck 10–11.) GameDay published on its website and circulated on social media posts featuring Coach Mike Krzyzewski

("Coach K"), Duke University's nationally known men's basketball coach. GameDay, perhaps jumping the gun, errantly categorized Duke University in its publications as one of its "partners." (Charbonneau Aff. Exs. A–C.) GameDay knew that Revel had established relationships with universities in North Carolina and expressly told Revel that GameDay intended to enter this state. (Machosky Aff. ¶ 74.)

C. Terms of the Agreement

60. The Agreement put GameDay on notice that Revel was headquartered in North Carolina and that GameDay was expected to regularly send payments into North Carolina. The opening paragraph of the Agreement states plainly that Revel is a North Carolina limited liability company, (Agrmt. 1), and paragraph five contains Revel's Winston-Salem, North Carolina billing address to which GameDay was directed to submit payments by check. (Agrmt. ¶ 5). Each form SOW generated under the Agreement also identifies Revel as a North Carolina limited liability company. (*See* Agrmt. Ex. B.) The Agreement is silent as to the place of performance of the duties under the contract, leaving those to be determined by each successive SOW. However, the Agreement's 4-year term, spanning from May 2021 to June 2025 indicates that the parties would, as GameDay represented to Revel in pre-contract discussions, inevitably expand into North Carolina during the lifetime of the Agreement. (*See* GameDay Pitch Deck 10–11.)

61. The agreement has a Delaware choice-of-law provision. (Agrmt. ¶ 25.) This factor does not favor the exercise of jurisdiction, but neither does it weigh strongly against jurisdiction given that neither party is organized under Delaware

law or based in Delaware. *See Tejal Vyas, LLC v. Carriage Park LP*, 166 N.C. App. 34, 41 (2004) ("[C]hoice of law clauses are not determinative of personal jurisdiction . . . .").

D. The Parties' Actual Course of Dealing

62. Revel obtained, at GameDay's request, certain branded goods for GameDay from North Carolina vendors. Revel argues that the knowing approval by GameDay of such purchases by Revel demonstrates purposeful availment from GameDay. GameDay responds that it did not specifically request, nor did it know, that goods would be procured from North Carolina vendors, and therefore GameDay's requests for goods under the Agreement do not constitute purposeful availment of North Carolina.

63. Our Supreme Court has recognized that, "regular contractual performance of a contractual obligation . . . is relevant [to a determination of personal jurisdiction] even if the location of the performance is not dictated by the contract." *Toshiba Glob. Com. Sols., Inc. v. Smart & Final Stores LLC*, 2022-NCSC-81 ¶ 22.

64. Revel had a contractual obligation under the parties' agreement to provide and transport all equipment and physical assets used for events and marketing activities. (Agrmt. ¶ 10(a).) Pursuant to this obligation, Revel was repeatedly asked by GameDay to procure tailgating equipment: branded coolers, tents, umbrellas, photo backdrops, and more; many of these products were procured from North Carolina vendors. (Strickland Aff. ¶ 27.) While GameDay apparently did not initially know that the products were sourced from North Carolina vendors, GameDay was put on notice

that Revel was using North Carolina suppliers to fulfill GameDay's requests in August 2021. On 13 August 2021, Strickland put Nieves in direct contact with Symphonix, a company based in Charlotte, North Carolina. (Strickland Aff. ¶ 29.) Nieves explained that GameDay needed photo backdrops and requested a quote from Symphonix. (Strickland Aff. Ex. E.) In so doing, GameDay endorsed the prospect of continuing to source products from a North Carolina vendor under the Agreement. The record contains no evidence tending to show that GameDay objected to the use of Symphonix or other North Carolina vendors. Instead, following Nieves's conversation with Symphonix, GameDay repeatedly approved and paid Revel for multiple orders of branded goods sourced from Symphonix. (Strickland Aff. ¶ 30.)

65. It is undisputed that the Agreement and SOWs were not drafted or signed in North Carolina and that the SOWs never requested marketing activities to be performed in North Carolina. (Parlor Aff. ¶¶ 15, 20–21, ECF No. 9.6.) However, GameDay knowingly contracted with a North Carolina company for a period of four years, during which time GameDay intended to enter North Carolina and make use of Revel's existing connections there. From 1 July 2021 to 1 November 2021, GameDay also sent regular, periodic payments totaling over one million dollars to Revel in North Carolina. Knowing that Revel used North Carolina vendors, GameDay continued to request and pay for branded goods from North Carolina vendors, voiced no objection to Revel's use of such vendors, and directly communicated with one of those vendors — Symphonix.

66.     Although this is a close case, the parties' contemplated future consequences and actual course of dealing support a determination that the Agreement has a substantial connection with the State of North Carolina and therefore, the exercise of jurisdiction over GameDay comports with due process.  As such, the Court concludes that it has personal jurisdiction over GameDay.

## IV. CONCLUSION

67.     For the foregoing reasons, the Court hereby **DENIES** the Motion.


**SO ORDERED**, this the 25th day of July, 2022.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases